951 F.2d 351
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ronnie Lee STEWART and Rodney Fred Delegal, Defendant-Appellants.
 Nos. 91-5174, 91-5177.
 United States Court of Appeals, Sixth Circuit.
 Dec. 20, 1991.
Motion to Reinstate Granted, Decision Reaffirmed
May 12, 1992.
 
 Before NATHANIEL R. JONES and DAVID A. NELSON, Circuit Judges, and JOINER, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Defendants Rodney Fred Delegal and Ronnie Lee Stewart were charged with and convicted of (1) conspiring to commit an offense against the United States in violation of 18 U.S.C. § 371 (1988), (2) committing a bank robbery in violation of 18 U.S.C. § 2113(a), (d) (1988), and (3) using a dangerous weapon in relation to a crime of violence in violation of 18 U.S.C. § 924(c) (1988). For the reasons that follow, we affirm the judgment below in all respects.
 
 
 2
 * Sometime prior to November 28, 1989, Stewart and Beacher Drell Roach drove to Cleveland, Tennessee to survey a local bank. On the morning of November 28, Stewart and Roach returned to Cleveland, this time accompanied by Delegal and Benjamin Leavern Wells, intending to rob the bank. The defendants traveled in two cars, one of which was to be abandoned.
 
 
 3
 Stewart, Delegal, and Wells entered the bank disguised and armed while Roach waited outside. After collecting the loot, they fled the scene by car. As they made their escape, however, a "dye-pack" hidden in the bag of stolen money discharged, releasing dye and tear gas into the vehicle's passenger compartment. The car was quickly abandoned, and the defendants eventually made their way back to Georgia.
 
 
 4
 Soon thereafter, the FBI learned that Roach had been involved in the robbery and decided to confront him. Roach agreed to audio-record surreptitiously his accomplices discussing the incident. He later recorded a conversation with Stewart wherein Stewart implicated himself in the robbery. Stewart was subsequently arrested and held in detention.
 
 
 5
 On August 5, 1990, nine days before trial was scheduled to begin, Stewart made statements to Roderick Stafford, a fellow inmate at the Hamilton County (Ohio) Jail, in which he further implicated himself in the robbery. Stafford passed news of Stewart's disclosures on to government agents and later testified at trial. The United States claims, and Stewart does not contest, that Stafford's account came as a total surprise to the United States Attorney.
 
 
 6
 Meanwhile, on December 8, 1989, Kentucky police officers had arrested Delegal on state stolen vehicle charges. At the time of his arrest, and in the presence of FBI Agent Dan Brennan, Delegal was advised of his Miranda rights. The police detained Delegal as an escaped prisoner in Owensburo, Kentucky. On January 12, 1990, criminal complaints were filed against Delegal for unlawful possession of a handgun by a convicted felon and unlawful escape from the Florida State Penitentiary. On January 23, 1990, a Kentucky state grand jury indicted Delegal on the state charges.
 
 
 7
 On January 24, 1990, Brennan learned that Delegal was a suspect in the bank robbery. Brennan visited Delegal, presented the information implicating him in the bank robbery, readvised him of his Miranda rights, and left Delegal an advice of rights form, telling him that he would return in the morning. The next day, Brennan readvised Delegal of his rights, and Delegal executed a second advice of rights form. Delegal proceeded to describe his involvement in the bank robbery to Brennan. No witnesses were present, and Brennan did not tape the conversation.
 
 
 8
 On January 29, 1990, Delegal was arraigned on the state charges. On or about that time, Ben Hawes, Jr. was appointed to represent Delegal on charges arising out of the January 23, 1990 state court indictment.
 
 
 9
 On February 6, 1990, Stewart and Delegal were indicted on federal charges relating to the bank robbery. Also named in the indictment were Wells and Roach. At a suppression hearing on August 10, 1990, after Delegal was found competent to stand trial, the district court denied his motion to suppress his confession. Trial commenced on August 14, 1990, in which all of the above confessions were admitted. The court denied defense motions for acquittal at the close of the government's evidence. On August 17, 1990, the jury convicted Delegal and Stewart on all three counts.
 
 
 10
 At the ensuing sentencing hearing, the court, upon motion of the government, departed upward pursuant to United States Sentencing Commission, Guideline Manual, § 4A1.3 (1990), adjusting Stewart's criminal history category from four to five. As a result, Stewart received a 125-month sentence on the bank robbery charge, while Delegal received 262 months. Both men were also sentenced to serve 60 months concurrently on the conspiracy charge and 60 months consecutively on the charge of use of a firearm in connection with a crime of violence. This timely appeal followed.
 
 II
 
 11
 We begin our analysis with various challenges to the validity of defendants convictions. Delegal's sole claim alleges that the admission at trial of his January 25, 1990 confession to Agent Brennan violated his Sixth Amendment right to counsel.[1]
 
 
 12
 The Sixth Amendment guarantees to criminal defendants the right to counsel in postindictment interviews with law enforcement authorities. Massiah v. United States, 377 U.S. 201, 205-07 (1964). Unlike the right to counsel secured under the Fifth Amendment, the Sixth Amendment right to counsel comes into existence regardless of whether the defendant is in custody, so long as adverse judicial proceedings have been initiated against him. See Patterson v. Illinois, 487 U.S. 285, 290, 298-99 (1988). Once a suspect against whom such proceedings have begun indicates his desire for the assistance of counsel, the authorities must cease interrogation, and any further questioning on the crime for which the defendant was indicted is forbidden unless counsel is present. McNeil v. Wisconsin, 111 S.Ct. 2204, 2207-08 (1991). As clarified in Patterson, however, the initiation of adverse judicial proceedings does not erect an absolute bar to postindictment police interrogation in the absence of counsel; rather, a defendant may be questioned where he knowingly and intelligently waives his right to counsel, thus establishing " 'an intentional relinquishment or abandonment of a known right or privilege.' " Patterson, 487 U.S. at 292 (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). In Patterson, the Supreme Court further held that advising a defendant of his right to counsel by means of Miranda warnings establishes that the ensuing waiver is knowing and intelligent:
 
 
 13
 As a general matter, ... an accused who is admonished with the warnings prescribed by this Court in Miranda has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.
 
 
 14
 Id. at 296 (citation omitted).
 
 
 15
 More recently, in McNeil, the Court held that, unlike the right to counsel embedded in the Fifth Amendment, an accused's invocation of his Sixth Amendment right to counsel is offense specific and, hence, does not extend to police interrogations of unrelated offenses. McNeil, 111 S.Ct. at 2207-08; see also Maine v. Moulton, 474 U.S. 159, 180 n. 16 (1985) ("Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are ... admissible at a trial of those offenses.").
 
 
 16
 In the case at bar, while an indictment against Delegal on state charges was handed down on January 23, 1990, formal proceedings on the federal charges at issue here did not commence until well after Delegal's January 25, 1989 confession to Agent Brennan. Thus, Brennan's interrogation could not have violated Delegal's as yet nonexistent Sixth Amendment rights predicated on the federal charges. Moreover, the district court found as a factual matter that Delegal never requested assistance of counsel and that he knowingly and intelligently waived any Sixth Amendment right to counsel he might conceivably have had, thus satisfying the requirements of Patterson. Although Delegal challenges both of these findings on appeal, our review of the record reveals no basis for disturbing the district court's finding. Accordingly, we conclude that the admission of Delegal's confession at trial did not constitute error.
 
 
 17
 Defendant Stewart likewise claims that the admission at trial of inmate Stafford's testimony regarding Stewart's incriminating statements violated the Sixth Amendment. The government responds that, because Stafford did not deliberately elicit the inculpatory remarks, his testimony did not transgress Stewart's Sixth Amendment rights.
 
 
 18
 In Kuhlman v. Wilson, 477 U.S. 436 (1986), the Court, drawing on its holdings in Massiah and United States v. Henry, 447 U.S. 264 (1980), reaffirmed that a secret government informant violates a defendant's Sixth Amendment right to counsel only where the informant acts in concert with law enforcement officials to deliberately elicit incriminating testimony from the defendant. The Court reasoned that such tactics constitute the " 'functional equivalent of interrogation.' " Kuhlman, 477 U.S. at 459 (quoting Henry, 447 U.S. at 277). Absent such deliberate elicitation, however, the defendant's Sixth Amendment rights remain unimpaired. As the Kuhlman majority explained,
 
 
 19
 a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.
 
 
 20
 Id. In Kuhlman, the Court found no deliberate elicitation where the defendant made incriminating remarks to an inmate-informant instructed by government agents to report the defendant's remarks but not ask questions, despite the fact that the informant told the defendant that his original, non-incriminating account of the crime "didn't sound too good." Id. at 460. In Moulton, by contrast, the Court found a Sixth Amendment violation where the informant repeatedly asked the defendant about details of the crime and encouraged the defendant to describe his plan for killing witnesses, thereby encouraging the defendant to make incriminating statements. Id. at 165-66.
 
 
 21
 At trial of the instant case, Stafford recounted his version of the conversation with Stewart as follows:
 
 
 22
 [Stewart] stated to me that he was a Federal prisoner, and I stated to him that I was a Federal prisoner, and we both discussed our charge and what we were locked up for....
 
 
 23
 ... [H]e asked me how long had I been up at the Hamilton County jail on my charge. I told him ever since March the 8th, and then he mentioned how long he had been up at the Hamilton County jail, that he said ever since January [sic]. And I said, man, I said, how come, why have you been, you know, in prison at this jail so long, why haven't you been to court or sent off yet.
 
 
 24
 And he said because the evidence that they had on him wasn't sufficient. He said when he got ready to go to court, they were going to drop all the evidence on him. I said what are you locked up for, he said bank robbery. I said bank robbery, and he said yeah.
 
 
 25
 .............................................................
 
 
 26
 ...................
 
 
 27
 * * *
 
 
 28
 And then I didn't ask him any questions, he just went on with the conversation and he started stating why, I mean, he started stating how they go about robbing the bank....
 
 
 29
 J.A. at 190-91 (emphasis added). A number of incriminating statements followed.
 
 
 30
 Stewart points to the emphasized language as proving that Stafford deliberately elicited the incriminating statements. The district court found, however, and we agree, that Stafford's conduct did not rise to the level of deliberate elicitation found objectionable in Moulton, but rather falls closer to the unobjectionable passive listener upheld in Kuhlman. While Stewart would have us construe Stafford's query regarding Stewart's prolonged detention as seeking to elicit inculpatory statements, we find this interpretation unpersuasive. Stafford's question was most likely intended to elicit precisely the information it did: the reason for the delay in the government bringing its case. We note also that Stewart made the inculpatory statements long after the challenged comment and apparently on Stewart's initiation. In sum, we find that admission of Stafford's testimony did not deprive Stewart of his Sixth Amendment right to counsel.
 
 
 31
 Stewart next argues that the district court improperly admitted part of the tape recording made surreptitiously by codefendant Roach of his conversation with Stewart about the robbery. Stewart specifically objects to the admission of Roach's question, "dye bomb, you know what it sounds like?", and Stewart's answer, "Uh huh." J.A. at 52. Through a somewhat attenuated chain of inference, Stewart contends that this exchange impermissibly signalled to the jury Stewart's previous experience with such devices, thus constituting evidence of a past crime inadmissible under Federal Rule of Evidence 404(b).[2]
 
 
 32
 We review trial court conclusions as to the admissibility of evidence to determine whether a substantial right of the party is affected. Fed.R.Evid. 103(a). Upon review, we believe that Roach's question went directly to whether Stewart was involved in the robbery at issue, not some other hypothetical crime. Furthermore, Roach's question was necessary for the jury to make sense of the ensuing exchange. Thus, its probative value clearly outweighed any possible prejudicial effect, and accordingly was admissible under Federal Rule of Evidence 403.
 
 
 33
 Finally, Stewart objects that FBI Agent Warren Moberg's testimony improperly suggested that Stewart was a career criminal, thereby destroying his presumption of innocence and rendering his trial unfair. This court has consistently disapproved of the introduction of prior criminal convictions where the defendant chooses not to testify and his character is not otherwise at issue. As explained in United States v. Terry, 729 F.2d 1063, 1070 (6th Cir.1984), "[a] criminal defendant who chooses not to testify at trial is entitled to a presumption of innocence. One sure way to destroy that presumption is for a seasoned officer to interject an 'inadvertent' remark about a defendant's criminal history." The Terry court explained that this court's role on appeal is
 
 
 34
 to review the record as a whole and determine whether these errors so adversely affected the rights of the defendants as to compel reversal. If not, then we must determine whether the exercise of our supervisory powers require[s], as a matter of sound judicial administration, the deterrent therapy of a new trial.
 
 
 35
 Id.
 
 
 36
 The challenged testimony arose as follows. In reference to Moberg's questioning of codefendant Wells some time after the robbery, the following exchange took place between Moberg and the prosecution on direct examination:
 
 
 37
 Q: Were you forceful or intimidating with him?
 
 
 38
 A: No. On the contrary, I was trying to be as calm and reasonable with him as possible, because I felt--because I did not know of any previous criminal conviction of his or any indication that he was a career criminal or anything of that nature. I felt that he had been brought into this bank robbery by others and was a participant, but not a participant [sic].
 
 
 39
 J.A. at 152 (emphasis added). After defense counsel moved for mistrial or severance, the district court denied the motion and proceeded with trial. No curative instructions were requested or given. Stewart insists that Moberg's testimony left the jury with the distinct impression that Wells' status of being a first-time offender implied a contrast to Stewart and the other defendants.
 
 
 40
 As an initial matter, we are unconvinced that a jury would have concluded from Moberg's testimony suggesting that Wells was not a career criminal that Stewart necessarily was. Moreover, this lone, indirect "reference" does not rise to the level of prejudice we have previously found to constitute reversible error. For example, in Terry, we upheld the defendant's conviction despite witness testimony that the defendant was on parole, a convicted felon, and consorted with felons. Terry, 729 F.2d at 1070; cf. United States v. Ailstock, 546 F.2d 1285, 1289-90 (6th Cir.1976) (finding reversible error in testimony that defendant admitted to having been in prison); United States v. Poston, 430 F.2d 706, 709 (6th Cir.1970) (finding FBI agent testimony that defendant had been on probation constituted prejudicial error). Accordingly, we find that Stewart suffered no prejudice as a result of Moberg's testimony.
 
 III
 
 41
 Stewart and Delegal also challenge their sentences imposed under the United States Sentencing Guidelines. Stewart's sole contention is that the district court's upward departure under United States Sentencing Commission, Guidelines Manual, § 4A1.3 (Nov. 1991), was improper.
 
 
 42
 After trial, the United States proposed that Stewart's criminal history category did not adequately reflect his criminal history, in part because Stewart had earlier received a single, consolidated sentence for two prior bank robberies. Accordingly, the court awarded Stewart three additional criminal-history points for the uncounted robbery, thus raising his criminal-history category from four to five. This effectively credited Stewart for each of the two prior bank robberies that had been consolidated for sentencing.
 
 
 43
 We review departures from the sentencing guidelines under a three-step process: First, we review de novo the circumstances relied on by the district court in determining that the case is sufficiently unusual to warrant departure. Second, we examine for clear error whether the circumstances, if conceptually proper, actually exist in the case before the court. Third, we determine whether the direction and degree of departure is reasonable. United States v. Christoph, 904 F.2d 1036, 1041 (6th Cir.1990), cert. denied, 111 S.Ct. 713 (1991). Considering first whether the circumstances articulated by the court were sufficiently unusual to warrant the upward departure, § 4A1.3 of the sentencing guidelines, entitled "Adequacy of Criminal History Category," states in relevant part as follows:
 
 
 44
 If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range....
 
 
 45
 .............................................................
 
 
 46
 ...................
 
 
 47
 * * *
 
 
 48
 A departure under this provision is warranted when the criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes. Examples might include the case of a defendant who ... (2) had received a prior consolidated sentence of ten years for a series of serious assaults....
 
 
 49
 U.S.S.G. § 4A1.3, p.s. (emphasis added). Thus, the guidelines clearly contemplate an upward departure in cases such as Stewart's where the defendant committed earlier, multiple crimes yet received a consolidated sentence. In United States v. Medved, 905 F.2d 935 (6th Cir.1990), cert. denied, 111 S.Ct. 997 (1991), a case closely on point with the one at bar, we affirmed an upward departure from criminal-history category three to category six where the defendant's sole prior felony conviction related to three separate bank robberies committed over a period of several months. Noting that the crimes might well have led to three separate felony convictions, we concluded, "[u]nder the circumstances presented here, we believe that [the district court] was justified in finding ... that Criminal History Category III significantly underrepresented the seriousness of [the defendant's] actual criminal history." Id. at 942; accord United States v. Gonzales, 929 F.2d 213, 217-20 (6th Cir.1991).
 
 
 50
 As to the factual basis for and degree of the departure, we similarly find no error. See United States v. Kennedy, 893 F.2d 825, 829 (6th Cir.1990) (holding that sentencing court must look to the next higher criminal history category before otherwise departing from the guidelines). Accordingly, we affirm the district court's upward departure for Stewart's sentence.
 
 
 51
 Finally, Delegal advances in a single-sentence argument that § 4B1.1 of the sentencing guidelines offends the constitutional prohibitions on ex post facto laws, double jeopardy, cruel and unusual punishment, and violates the Equal Protection Clause of the Fourteenth Amendment. We find Delegal's claims wholly without merit. We have recently held that the career offender provision embodied in § 4B1.1 of the guidelines withstands ex post facto and double jeopardy challenges. See United States v. LaSalle, No. 91-3337, slip op. at 7 (6th Cir. Nov. 5, 1991). We find Delegal's Eighth and Fourteenth Amendment challenges equally untenable. See United States v. Walton, 908 F.2d 1289, 1300 (6th Cir.) (holding that sentencing guidelines do not violate Eighth Amendment), cert. denied, 111 S.Ct. 273, 530, 532 (1990); United States v. Hayden, 898 F.2d 966, 967 (5th Cir.1990) (finding that career offender provisions do not violate Equal Protection Clause).
 
 IV
 
 52
 For the reasons set forth above, we AFFIRM the judgment of the district court.
 
 ORDER.
 
 53
 May 12, 1992.
 
 
 54
 Appellant Rodney F. Delegal, filed a motion to reinstate his appeal, asking this Court to reconsider our prior opinion in United States v. Delegal, No. 91-5177 (6th Cir. Dec. 20, 1991). Appellant has filed a supplemental brief in support of his motion to reinstate. The motion is hereby GRANTED.
 
 
 55
 Upon review of appellant's supplemental brief, together with the evidence of record, this Court finds that appellant has raised no issue of fact or law that would in any way alter our original disposition of his appeal. Accordingly, the decision of December 20, 1991 is hereby REAFFIRMED.
 
 
 
 *
 The Honorable Charles W. Joiner, Senior Judge of the United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Delegal does not allege that the government may have violated his Fifth Amendment right to counsel. Accordingly, we assume for purposes of this appeal that Delegal's confession comported with the requirements of the Fifth Amendment
 
 
 [2]
 Rule 404(b) provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.